**UNITED STATES of America, Appellee,**

**v.**

**Rebecca B. WHITE, Defendant, Appellant.**

**No. 96–2215.**

United States Court of Appeals, First Circuit.

Heard June 3, 1997.

Decided July 28, 1997.

David Beneman, Portland, ME, with whom Levenson, Vickerson & Beneman was on brief, for appellant.

Margaret D. McGaughey, Assistant United States Attorney, Portland, ME, with whom Jay P. McCloskey, United States Attorney, Bangor, ME, and Jonathan A. Toof, Assistant United States Attorney, were on brief, for appellee.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and BOUDIN, Circuit Judge.

CYR, Senior Circuit Judge.

Defendant Rebecca White challenges a district court ruling which declined to sentence her below the statutory minimum prescribed by the Sentencing Reform Act of 1984, 21 U.S.C. § 841(b)(1)(A)(vii), pursuant to the so-called "safety valve" provisions, *see* 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2, on the ground that White had not truthfully provided the government with all the information and evidence she had concerning her offense. *See* 18 U.S.C. § 3553(f)(5); U.S.S.G. § 5C1.2(5).[1] As there was no error, we affirm.

# I

## BACKGROUND

Along with eight codefendants and various other individuals, White was involved in a large-scale, long-term marijuana distribution ring from 1986 to 1994. Led by Stuart Smith and White's then-boyfriend (and current husband), Gary Dethlefs, the conspiracy was responsible for importing tens of thousands of kilograms of marijuana from Arizona, Texas and Mexico for distribution in Maine and Massachusetts. The business hub of the conspiracy was a farm in Mansfield, Massachusetts, owned by White and her three siblings, at which White and Dethlefs resided. There, marijuana shipments were received for storage, packaging and distribution, drug transactions were negotiated, and

large cash sums representing drug proceeds were kept. White, and others under her direction, counted and packaged the cash for delivery to the marijuana suppliers. White purchased hundreds of thousands of dollars in money orders and cashier's checks, with which to cover operating expenses. A calendar recovered at the farm contained numerous cryptic notations by White, recording marijuana-related financial transactions in which the criminal enterprise engaged.[2]

Ultimately, White was indicted for, *inter alia*, conspiring to possess, with intent to distribute, more than one thousand kilograms of marijuana. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846. After pleading guilty, she submitted to three so-called "safety valve" interviews by government agents, during which she proffered information regarding the marijuana conspiracy, including her role in it. At sentencing, the parties disagreed about whether the "safety valve" proffer made by White had been fully forthcoming and truthful.

The government represented to the court that White had displayed reluctance to make full disclosure. For example, it emphasized that she had failed to disclose all her information about a particular marijuana supplier until the agents challenged her omissions with various notations from her calendar, *supra*, and that she had not been fully forthcoming about an individual who had supplied her with cocaine for her own use. The government maintained that White had portrayed herself in the role of a minimal, passive participant without much direct knowledge of the criminal conduct in which the enterprise was engaged.[3] The government insisted, on the other hand, that White had played an integral role in the conspiracy, serving as the financial manager and "brains" of the drug operation.

White contended that her role in the conspiracy (for which she was convicted) was that of a minor participant. According to White, she suspected that there was a lot more criminal activity than she actually knew about. White reportedly did not want to know of suspected drug trafficking activities that were occurring around her, so she insulated herself by remaining uninformed.

1. Since the relevant statutory and sentencing guideline provisions contain identical language, we cite only to the sentencing guideline.

2. Based on these facts, the presentence report ("PSR") described White as the money launderer/manager of the conspiracy.

3. Notes recorded during the first "safety valve" interview reflect as follows:

At sentencing, Agent O'Donoghue, who had investigated the marijuana conspiracy and participated in two "safety valve" interviews, testified that though the information White provided was consistent, in most respects, with intelligence gathered by the government from other sources, she had not been forthcoming about either the marijuana supplier or her personal cocaine supplier and she had tried to minimize her own role in the conspiracy. The presiding judge likewise expressed unease that White appeared to have portrayed herself in a lesser role, stating that he was very familiar with the case, in part due to his involvement in related proceedings against certain coconspirators, and that it seemed White had played a more central role than she admitted to during her "safety valve" interviews.

White responded that any vagueness in her disclosures during the "safety valve" interviews had resulted from her alcohol and drug abuse, and that she had minimized her role because that was the way she actually perceived it as a consequence of her clinical depression syndrome. White supported her theory with a report and testimony from a psychologist.

The district court established the guideline sentencing range (GSR) at 108 to 135 months and noted that the statutory minimum sentence for the offense was 120 months, *see* 21 U.S.C. § 841(b)(1)(A)(vii). The district court noted, however, that but for the statutory minimum, it would have departed below the GSR, to 72 months' incarceration. Finally, although the court could have imposed a sentence below the statutory minimum had White met the "safety valve" requirements under U.S.S.G. § 5C1.2, it decided instead to sentence her to 120 months' incarceration on the ground that she still had not *truthfully* provided the government with all information and evidence she possessed concerning her offense, in accordance with the requirements of U.S.S.G. § 5C1.2(5) that—

not later than the time of the sentencing hearing, the defendant has *truthfully* provided to the Government *all information and evidence* the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(5) (emphasis added). Specifically, the district court found that White's "safety valve" interviews untruthfully minimized her role in the conspiracy and disclaimed direct knowledge about the conspiracy. The district court further found the report and testimony provided by the psychologist insufficiently credible or reliable either to explain away or excuse White's untruthfulness.[4] White asserts several claims of error, to which we now turn.

## II

### DISCUSSION

First, White claims that once she had satisfied her preliminary burden by demonstrating compliance with U.S.S.G. § 5C1.2 through her "safety valve" proffer, the government was required to rebut her initial showing. *See United States v. Miranda–Santiago*, 96 F.3d 517, 529 & n. 25 (1st Cir.1996). White argues that she credibly demonstrated that she had provided the government with all information she reasonably could have been expected to possess, that the government's attempted rebuttal failed, *see supra* note 4, and that she therefore was entitled to relief under the "safety valve" provision. She likewise assigns error in a so-called *"sua sponte"* factual determination by the district court that her proffer had been

---

4. The district court supportably determined that the two items highlighted by the government as examples of incomplete disclosure by White—regarding the marijuana supplier and her personal cocaine supplier—were irrelevant to the "safety valve" determination. It determined that White *eventually* did disclose all known information about the marijuana supplier before sentenc-

ing, *see* U.S.S.G. § 5C1.2(5) ("not later than the time of the sentencing hearing, the defendant has truthfully provided . . ."), and that her personal cocaine supplier was not connected with the offense conduct, *see id.* ("all information and evidence . . . concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. . . .").

untruthful, in that it portrayed her in a minor conspiratorial role, since no such contention was ever raised by the government. Finally, White contends that the findings of fact made by the district court were based upon its recollection of the trial and sentencing of her coconspirators, but that no *record* evidence in these proceedings supports its findings.[5] We disagree.[6]

Contrary to White's contention, the record clearly demonstrates that the government consistently maintained that her "safety valve" proffer had been untruthful in portraying herself as a minor participant in the marijuana enterprise.[7] Although the government did emphasize her lack of disclosure regarding the marijuana and cocaine suppliers, it cited those instances to demonstrate its more generalized concerns with the disclosure.

Furthermore, White's suggestion that the district court somehow acted "*sua sponte*" in making its findings regarding her role in the conspiracy cannot withstand scrutiny. For one thing, the appropriateness of White's portrayal of her role in the conspiracy was in dispute throughout the sentencing hearing. Consequently, her claim that the district court committed legal error by assuming the government's mantle in attempting to rebut her contention is groundless.

■ More importantly, the district court could not rule on White's request for relief under the "safety valve" provisions without first making its own *independent* determination as to whether she had satisfied U.S.S.G. § 5C1.2, including its requirement that all information she possessed about the offense conduct had been truthfully disclosed, *id.*

§ 5C1.2(5). *See id.* § 5C1.2 ("the court shall impose a sentence in accordance with the applicable guidelines ... *if the court finds* that the defendant meets the criteria ...") (emphasis added); *Miranda–Santiago,* 96 F.3d at 530 n. 27 ("a plea agreement—even a binding one—does not replace the independent determination of the district court as to whether this [safety valve] provision applies."); *United States v. Montanez,* 82 F.3d 520, 523 (1st Cir.1996) ("It is up to the defendant to persuade the district court that he has 'truthfully provided' the required information and evidence to the government .... such a determination would rest in the hands of the judge, not the prosecutor."); *United States v. Thompson,* 81 F.3d 877, 880 (9th Cir.1996) ("it is the court, and not the Government, that determines whether a defendant qualifies for relief under § 5C1.2"). Therefore, were the sentencing court required to predicate its "safety valve" determination only on theories raised by the government, as White insists, its responsibility for arriving at an independent determination regarding a criminal defendant's eligibility for relief would be unduly restricted.

■ White's further argument that the government was required to produce rebuttal evidence is premised entirely on our statement in *Miranda–Santiago,* that once a defendant credibly demonstrates that she has provided all information she reasonably could have been expected to possess, "[t]he government cannot assure success simply by saying 'We don't believe the defendant,' and doing nothing more." *Miranda–Santiago,* 96 F.3d at 529. Rather, "the government

---

5. Although White likewise represents that it was error to hold that a defendant cannot benefit from the "safety valve" provision unless she provides the information in a form useful to the government, the district court made no such ruling.

6. On appeal, interpretations of the "safety valve" provisions, under the statute, 18 U.S.C. § 3553(f), and the guideline, U.S.S.G. § 5C1.2, are reviewed *de novo.* On the other hand, we review for clear error the factual findings relating to whether a defendant has qualified for the "safety valve" provisions. *See Miranda–Santiago,* 96 F.3d at 527.

7. For example, at one point the government argued that White should not receive the benefit of the "safety valve" provision, due to "her lack of [candor,].... [S]he was less than honest with us and; secondly, ... she was the brains behind the outfit in our estimation, as far as being able to handle the finances and make arrangements for payment. She is more than a minor participant." The government later provided clear support for its position, by asking Agent O'Donoghue to describe White's role in the conspiracy. O'Donoghue responded that it was his "impression she tried to minimize or give us the impression of minimizing her particular role in the conspiracy."

must at least come forward with some sound reason to suggest otherwise." *Id.* at 529 n. 25. White argues that since the government cannot simply say: "we don't believe," then neither can the district court. *Miranda–Santiago* is inapposite to the present dispute, however.

There was *no* evidence that the defendant in *Miranda–Santiago* had been untruthful in her "safety valve" proffer, even though the government there incorrectly contended that her "failure [to be truthful] '[could] be gleaned from the Presentence Report.'" *Id.* at 526. The district court apparently adopted the government's characterization of the PSR, *in toto,* as it simply concluded that "5C1.2 does not apply, because [the defendant] has not cooperated fully as required by guideline Section 5C1.2(5)." *Id.* Contrary to the government's suggestion, however, the PSR had afforded direct support for the defendant's claim that she had played a minor, passive role in the conspiracy. *Id.* at 529.

Thus, *Miranda–Santiago* in no sense suggests that the sentencing court cannot arrive at an independent determination regarding a criminal defendant's truthfulness, based on the evidence before it. Rather, we there held merely that it was clear error to conclude that the defendant had been untruthful, based solely on a PSR which directly contradicted the district court's determination. *See id.* at 529–530 ("[the] district court's bare conclusion that [the defendant] did not 'cooperate fully,' absent either specific factual findings or easily recognizable support in the record, cannot be enough to thwart her effort to avoid imposition of a mandatory minimum sentence.").

On the other hand, the district court below made detailed findings regarding White's untruthfulness:

> What troubles me is that early on in this interview she attempted to minimize her role in this conduct, the total offense conduct of this conspiracy. And I am, as certain as I am sitting here, that she is untruthful in that respect; she was untruthful.... And it is not at all as she portrayed it and attempted to portray it .... she was a very integral part of the

supervision and management and operation of this conspiracy. And it was disingenuous and dishonest of her, in my view, ... to portray to the officers and Mr. Toof in the course of this safety valve debriefing, that she has a minimal role, that she didn't know very much about it, that she didn't understand all of the things that happened, and to relate the information as if it was something that came to her by hearsay and by indirect knowledge....

> She had been in this conspiracy for a long time. The nature of her conduct, as I know it to have been, was on a daily basis, tending to the business affairs of the conspiracy that at any given time involved the distribution of very significant quantities of marijuana, the storage of it, the warehousing of it, the procuring of it, and the managing of the distribution at any given time of hundreds and thousands of dollars over a period of time, several times ...

(Oct. 16, 1996 Trans. at 68–70). Thus, the district court, based on extensive evidence and after vigorous argumentation by counsel, made the carefully considered determination that White lacked credibility. (*See, e.g.,* Oct. 16, 1996 Trans. at 66: "I have given a huge amount of thought ... to this issue ... and I have ... th[is] difficulty with her conduct...."). Its finding therefore went well beyond the "bare conclusion" relied upon in *Miranda–Santiago,* 96 F.3d at 529.

█ Finally, ample record evidence supported the district court finding. For one thing, the PSR fairly characterized White as having played a major role in the conspiracy, as its money launderer/manager. *See supra* note 2. Indeed, most conspiratorial conduct attributed to her in the PSR was never challenged by White, who chose instead to debate its *characterization* that she had been a supervisor or manager. Similarly, White declined the opportunity to cross-examine Agent O'Donoghue, who testified that she had attempted to minimize her role in the conspiracy and that she was more actively involved than she wanted the government agents to believe. Accordingly, there was no error.

## III

### *CONCLUSION*

For the reasons discussed above, the district court judgment is *affirmed.*